JAMES F. PETERSEN,                              )
                                                )
                        Plaintiff,              )
                                                )
            v.                                  )          **ORDER**
                                                )
RODNEY MIDGETT, former Sheriff                  )
of Dare County, et al.,                         )
                                                )
                        Defendants.             )

On September 9, 2012, James F. Petersen ("Petersen" or "plaintiff") filed suit against Paige Lea Meads ("Meads" or "Sergeant Meads"), in her individual capacity, Tommy Ambrose ("Ambrose" or "Sergeant Ambrose"), in his individual capacity, Terry T. Blanchard ("Blanchard"), in his individual capacity, John Does 1-3 and Jane Doe, in their individual capacities, Rodney W. Midgett ("Midgett"), in his official capacity, J.D. Doughtie ("Doughtie" or "Sheriff Doughtie"), in his official capacity, the Ohio Casualty Insurance Company ("OCIC"), as surety, John Doe 1 Surety Company, John Doe 2 Surety Company, and Dare County. Compl. [D.E. 1] 1–6.[1] The complaint alleged negligence and gross negligence, a statutory-bond claim, and federal claims pursuant to 42 U.S.C. § 1983 for deliberate indifference to serious medical need, failure to train, and failure to develop and implement proper policies. See Compl. ¶¶ 90–126. On December 24, 2012, Petersen filed an amended complaint [D.E. 42], which removed all "Doe" defendants.

On April 30, 2013, Petersen stipulated to the dismissal of Rodney W. Midgett as a defendant [D.E. 52]. On June 6, 2013, Petersen filed a second amended complaint [D.E. 59], which named

---

[1] The complaint and docket incorrectly spell plaintiff's last name as "Peterson," rather than Petersen. See Petersen Dep. [D.E. 83-1] 7 (deposition page 6). The court has changed the caption of this case to reflect the proper spelling.

Meads, Ambrose, Blanchard, Doughtie, OCIC, and Dare County as defendants (collectively, "defendants").

On September 30, 2014, defendants moved for summary judgment [D.E. 78] and filed a supporting memorandum [D.E. 86] and numerous exhibits [D.E. 79–85]. On October 14, 2014, Petersen moved for sanctions for spoliation [D.E. 88] and filed a supporting memorandum [D.E. 92] and numerous exhibits [D.E. 88–91].

On October 21, 2014, Petersen stipulated to the dismissal of Blanchard and Dare County as defendants and to the dismissal of the section 1983 claim against Sheriff Doughtie for failure to train and failure to develop and implement proper policies [D.E. 94]. The remaining claims are: (1) negligence and gross negligence against Meads, Ambrose, and Doughtie; (2) statutory-bond claim against Doughtie and OCIC; and (3) deliberate indifference to serious medical need against Meads and Ambrose. Second Am. Compl. [D.E. 59] ¶¶ 103–29.

On October 31, 2014, defendants responded in opposition to Petersen's motion for sanctions for spoliation [D.E. 96]. On November 3, 2014, Petersen responded in opposition to defendants' motion for summary judgment [D.E. 97]. On November 4, 2014, Petersen filed a "corrected" response in opposition to defendants' motion for summary judgment, which contained an additional exhibit, a second supplemental report by plaintiff's expert Dr. Paul Adler. See [D.E. 98, 98-3]. On November 8, 2014, defendants moved to strike Dr. Adler's second supplemental report [D.E. 99] and filed a supporting memorandum [D.E. 100].

On November 15, 2014, Petersen replied to the defendants' response to the motion for sanctions for spoliation [D.E. 102]. On November 25, 2014, Petersen responded in opposition to defendants' motion to strike Dr. Adler's second supplemental report [D.E. 110]. On December 4, 2014, defendants replied to Petersen's response to the motion for summary judgment [D.E. 115]. On December 12, 2014, defendants replied to Petersen's response to the motion to strike Dr. Adler's supplemental report [D.E. 117].

2

As explained below, the court grants defendants' motion to strike and defendants' motion for summary judgment, and dismisses plaintiff's motion for sanctions for spoliation as moot.

I.

Petersen has a history of alcohol and drug use. Petersen Dep. 103–111, June 19, 2014.[2] Petersen started drinking in the seventh grade and has battled alcoholism since adolescence. Id. 152, 156. Around 2007, Petersen began drinking on a daily basis. Id. 38, 110. In 2008, Petersen would binge on alcohol "[a]ll the time." Id. 154. Petersen preferred beer and wine to liquor, and could drink "a 12 pack [of beer] . . . and not even think about it." Id. 147, 160. Petersen could drink a case of beer a day. Id. 160.

Petersen's drinking has led to numerous arrests, including several detentions at the Dare County Detention Center ("DCDC"). Id. 58–74; see Dep. Exs. 25–27, 54; Blanchard Dep. 9 (noting that Petersen came into the DCDC "on the regular"). On April 8, 2008, during an incarceration at the DCDC, Sergeant Meads, a DCDC shift supervisor, placed Petersen on suicide watch. Meads Dep. 68–69; see Dep. Exs. 26 at 5, 54 at 1.

On September 10, 2009, Petersen drank beer at his parents' home. Petersen Dep. 163–65, June 19, 2014. Petersen drank approximately 15 beers, which was an atypically large amount for him to drink during that month. Id. 165. Petersen may have also drank some wine that night. Id. 168.

Petersen had a court date scheduled for September 11, 2009, regarding a November 2008 charge for driving while intoxicated. Id. 165–67. On the morning of September 11, 2009, before heading to court, Petersen drank "[a] couple of beers" because he was hung over from the night before and was nervous about his court appearance. Id. 167–69.

---

[2] Due to their length, the depositions submitted to this court in support of defendants' motion for summary judgment were divided and filed in separate docket entries. As a result, all page references following a "Dep." cite in this order refer to the deposition page, not the docket entry page.

Case 2:12-cv-00060-D   Document 118   Filed 09/25/15   Page 3 of 29

At the courthouse, a bailiff smelled alcohol on Petersen. Id. 165–66, 170–71. The bailiff informed Judge Barnes, and Judge Barnes ordered Petersen to be breathalyzed. Id. 171–72. An Alco-Sensor test was administered, and it listed Petersen's blood alcohol content ("BAC") as .32. Id. 172; Dep. Ex. 28 at 1–2. Judge Barnes held Petersen in contempt of court for "appear[ing] in court to answer charge, while being under the influence of alcohol," and ordered Petersen to be placed in custody for 72 hours beginning at 12:18 p.m. Dep. Ex. 28; see Dep. Exs. 25, 29. Petersen was then taken to the DCDC. Petersen Dep. 173.

At 12:47 p.m. on September 11, 2009, Sergeant Meads began booking Petersen into the DCDC. Meads Dep. 20, 53; see Dep. Ex. 30. While booking Petersen, Meads was aware that Petersen had just arrived from court and smelled of alcohol, but she only had Petersen's temporary commitment order at the time of booking, which did not note the reason for Petersen's contempt-of-court commitment or his BAC. Meads Dep. 22, 58, 160–61; see Dep. Exs. 29, 35.

As part of the booking process, Sergeant Meads completed a medical screening form and a mental-health screening form for Petersen. Dep. Exs. 35, 71. Based on Petersen's answers to Meads's questions and Meads's observations of Petersen, Meads concluded that Petersen was "highly intoxicated," although she was not aware of his specific BAC. Meads Dep. 25–26, 56–57; see Dep. Ex. 71. Petersen responded "no" to the question "Should we be concerned about the possibility of withdrawals from alcohol, drugs or medication?," and Meads noted "not at this time." Dep. Ex. 35. Petersen's mental-health screening was positive, so, following protocol, a mental-health facility was called. Meads Dep. 31–34; Simmons Dep. 15–16; see Dep. Ex. 29 (noting a mental-health appointment for Petersen on September 17, 2009); Dep. Ex. 71. Meads did not note any visible signs of injury or illness on Petersen's medical-screening form. Meads Dep. 99; see Dep. Ex. 35. The booking process also included photographing Petersen. See Dep. Exs. 32–33.[3]

---

[3] Although the photos are dated September 11, 2009, the photos appear identical to photos linked to Petersen's November 2007 booking report. See, e.g., Dep. Ex. 78 (booking report dated

4

Petersen initially was assigned to the C-pod section of the jail. Meads Dep. 53; see Dep. Ex. 30. Because Petersen was intoxicated, he was not able to be classified. Meads Dep. 27–28, 53–54; cf. Ambrose Dep. 37; Dep. Ex. 9 at 2 (DCDC Facility Medical Plan noting that "[a]nyone that is determined to be intoxicated during the booking process will be housed in a holding cell in the booking area until . . . the inmate is sober"). Typically, unclassified inmates are placed in holding cells near the front of the jail, rather than being sent directly to their assigned pod, so that they can be monitored. Dep. Ex. 21 at 2–3; see Ambrose Dep. 35.

According to DCDC policy, detention officers are to monitor unclassified inmates four times per hour. Ambrose Dep. 13, 35; Meads Dep. 65, 89–90, 93–94; Dep. Ex. 21 at 3. Detention officers are also required to monitor intoxicated inmates, inmates on suicide watch, and inmates who have "a previous record of mental illness" four times per hour. Dep. Ex. 14 at 3; Dep. Ex. 17; Dep. Ex. 18 at 2–3; see also Ambrose Dep. 13, 35; Alexander Dep. 19–20. When an inmate is on special watch, detention officers are to mention that inmate in the jail-log report for that round. See Meads Dep. 78, 90; Ambrose Dep. 15. Detention officers are instructed regarding the need for a special watch for any particular inmate by the shift supervisor, and the need for special watch is ordinarily noted in the jail's pass-down notes. See Meads Dep. 77; Zafra Dep. 39. Absent the need for a special watch, detention officers "will conduct supervision rounds of all general population housing units and will directly observe inmates at least twice per hour." Dep. Ex. 18 at 1–2; see Dep. Ex. 17.

When the holding cells are full, unclassified inmates are sometimes placed in C-pod. Ambrose Dep. 38. If an unclassified inmate is placed directly in C-pod, he or she is normally "automatically put . . . on a 15 minute watch. Just like if they'd been kept front in holding." Ambrose Dep. 38.

_____

November 15, 2007). Nonetheless, viewing the facts in the light most favorable to Petersen, the court assumes the photos were taken on September 11, 2009.

5

On September 11, 2009, the holding cells were full; therefore, Petersen was sent directly to C-pod. Meads Dep. 55. Although Petersen was unclassified, intoxicated, and had a history of being placed on suicide watch, he was not monitored every 15 minutes while in C-pod during the afternoon of September 11, 2009. See Dep. Exs. 44–46 (reflecting, without specifically mentioning Petersen, that C-pod was monitored roughly every 30 minutes between 1:29 p.m. and 3:42 p.m., then again at 5:33 p.m. for "final rounds" of the day shift); see also Meads Dep. 88–90 (acknowledging that the jail log does not reflect that the officers monitored Petersen every fifteen minutes); Meads Dep. 95–96 (agreeing that Petersen should have been monitored at least four times an hour after his admission, that the rounds should have been documented, and that Petersen should have been mentioned by name in those rounds). Meads believes she "more than likely, told [her] officer[s] [to monitor Petersen]; and placed [it] in the pass-down notes." Meads Dep. 94; see id. 77–78, 99–100; id. 165 ("I can assure you, . . . somewhere in my pass-down notes, it was placed to make sure that [Petersen] was monitored."); id. 167 (noting that Meads is "almost positive" she "wrote in the pass-down notes instructions that Mr. Petersen should've been monitored four times an hour").

At 6:00 p.m. on September 11, 2009, the shifts changed, and Sergeant Ambrose replaced Sergeant Meads as the on-duty shift supervisor. Ambrose Dep. 6–7; Meads Dep. 100, 104; see Dep. Ex. 39. Officer Spruill and Officer Zafra were the detention officers responsible for B-pod and C-pod during the September 11, 2009 night shift. Spruill Dep. 9; Zafra Dep. 7–8; Dep. Ex. 39. According to the jail log, the B and C pods were monitored at 6:02 p.m., 6:43 p.m., 7:16 p.m., 7:38 p.m., 7:53 p.m., 9:02 p.m., 9:32 p.m., 10:03 p.m., and 10:46 p.m. during the evening of September 11, 2009. Dep. Ex. 46; see Ambrose Dep. 14–15 (jail logs from the evening of September 11, 2009, do not reflect observation times of at least every 15 minutes or that anyone was on special watch). The jail-log entries for these rounds did not specifically mention Petersen. Dep. Ex. 46. At 9:00 p.m., Officer Zafra gave Petersen 1000 milligrams of acetaminophen (Tylenol). Zafra Dep. 31–32; Dep. Ex. 36; Dep. Ex. 31.

6

During the early morning of September 12, 2009, rounds were made at 12:05 a.m., 1:13 a.m., and 1:55 a.m. Dep. Exs. 46–47; Spruill Dep. at 33 (acknowledging that the logs show that prior to 2:37 a.m. on September 12, 2009, rounds were being made two times an hour or less). At 1:30 a.m., Officer Spruill gave Petersen another 1000 milligrams of acetaminophen. Spruill Dep. 18; Dep. Ex. 36; Dep. Ex. 31.

At some point during the night, Petersen felt sick. Petersen Dep. 175–76, 181, June 19, 2014. Petersen recalls wanting a drink while he was lying in bed, and "the next thing [he knew, he] was on the floor." Id. 175, 181–82. Petersen had either fallen out of or rolled out of bed, and when he "tried to get up, . . . [his] limbs didn't work." Id. When Petersen attempted to get up, Petersen hit the left side of his head "on the wall, right in the crease where it meets the floor." Id. 175, 182–83. Petersen then checked the left side of his head to see if it was bleeding. Id. 175, 183–84. Petersen does not remember seeing blood. Id. 188–89. Petersen does not know how long he was on the floor. Petersen Dep. 49–50, Aug. 6, 2014.

Starting at 2:37 a.m., the jail logs begin to specifically mention Petersen. See Dep. Exs. 46–47. Monitoring also increased for the remainder of the night shift. See Dep. Ex. 47. The remainder of the night-shift logs, which specifically reference Petersen being "ok", reflect that rounds were made at 2:37 a.m., 2:52 a.m., 3:00 a.m., 3:15 a.m., 3:28 a.m., 3:46 a.m., 4:05 a.m., 4:15 a.m., 4:32 a.m., 4:47 a.m., 5:00 a.m., 5:15 a.m., and 5:30 a.m. Dep. Ex. 47; see also Dep. Ex. 31. Some of those logs specifically note that Petersen was "laying down on his bunk." Dep. Ex. 47. Neither Officer Zafra nor Officer Spruill recall whether they found Petersen on the floor. Zafra Dep. 57–58; Spruill Dep. 9. Sergeant Ambrose does not recall if he was called into Petersen's cell during the early morning of September 12, 2009, but he acknowledges that the jail reports reflect that Petersen was placed on special watch starting at 2:37 a.m. Ambrose Dep. 12–24; see Spruill Dep. 17–18, 33–34; Zafra Dep. 60–62; Doughtie 30(b)(6) Dep. 210–211. Ambrose testified that there could be "several different reasons" why he would have placed Petersen on special watch at that

7

time, such as "realiz[ing Petersen] had not been classified and was supposed to have been on . . . 15 minutes [watch] all along and institut[ing watch] like it was supposed to be" or "to keep an eye on [Petersen] because he'd been found on the floor and [they] had to wake him up and put him back on the bed." Ambrose Dep. 15–16. No incident report was created concerning Petersen or the decision to place him on special watch.

At 6:00 a.m., the shifts changed again, and Sergeant Meads returned to duty. Meads Dep. 112. Shortly after Meads returned to work, Officer Zafra handed her a note, which asked Meads to "Check on Mr. Petersen" or "Keep an eye on Mr. Petersen" but did not mention that anything had happened to Petersen. Meads Dep. 113–15, 131. Meads does not believe there was any reference to Petersen or any 2:00 a.m. incident in the pass-down notes given to her by Sergeant Ambrose. Meads Dep. 141, 171; cf. Spruill Dep. 48 (Spruill does not specifically remember communicating to the following shift that Petersen was on special watch, but that is the type of information that would be passed on). The jail logs reflect that the incoming day shift did not continue the special watch that Ambrose had instituted for Petersen, and instead officers monitored both pods at 6:03 a.m., 6:59 a.m., and 7:34 a.m. See Dep. Ex. 45; Meads Dep. 112. These logs did not specifically mention Petersen.

Before breakfast was served to the inmates, Meads "checked on Mr. Petersen" with Officer Blanchard, one of the detention officers responsible for B and C pods during the September 12, 2009 day shift. Meads Dep. 116–17. Meads observed Petersen standing at the door, and she talked with him. Id. 117, 124–25. Petersen complained that he was not feeling well and mentioned having a headache and an upset stomach. Id. Meads "told [Petersen] . . . [that she] wanted him to try to eat something, and if he couldn't eat or if he wasn't . . . feeling well after breakfast, to let [her] know." Id. 117. While speaking with Petersen, Meads did not notice any signs of injury, but she did not look closely and was looking through a small, dirty window. Id. 125. Blanchard did not notice any marks or bruises on Petersen's head. Blanchard Dep. 59.

8

Around 6:40 a.m., Petersen refused his breakfast. Blanchard Dep. 56, 61; Meads Dep. 120–21. When an inmate refuses to eat, detention officers must have the inmate sign a meal-refusal form and must take the form to the shift supervisor. Blanchard Dep. 55–56. Blanchard had Petersen sign the inmate refusal form, which noted that Petersen refused the meal because he "doesn't feel good, has a fever, [and is] not hungry." Dep. Ex. 37. Blanchard also signed the form. See id. At some point within the next hour, Blanchard brought the form to Sergeant Meads, who also signed the form. See id.; Blanchard Dep. 56–65; Meads Dep. 120–21.

Upon receiving the form, Sergeant Meads noticed a marked difference in Petersen's signature, which she was familiar with from the medical screening and property-record forms Petersen had filled out with her the previous day. Meads Dep. 122; compare Dep. Exs. 34–35, with Dep. Ex. 37. The change in Petersen's signature raised concern with Meads. Meads Dep. 123. Meads decided to move Petersen to holding so that he could be monitored more closely. Meads Dep. 123–24; Blanchard Dep. 63–64. Petersen was brought to holding cell 1249 at approximately 7:45 a.m. See Dep. Ex. 38; Blanchard Dep. 64–66; cf. Dep. Ex. 30. After placing Petersen in the holding cell, Officer Blanchard went back to B pod. Blanchard Dep. 66.

Very shortly thereafter, Sergeant Meads checked on Petersen. Dep. Ex. 38. Meads asked Petersen how he was feeling, and Petersen responded "not good today." Id. "As soon as [Petersen] finished his statement he 'clinched up' drawing his hands up tightly to his chest, moaned and yelled and began sliding down the wall quicky." Id.; see Meads Dep. 126. Meads yelled for someone to "Call 911; he's having a seizure." Simmons Dep. 18; see Meads Dep. 126; Dep. Ex. 38. Officer Simmons called 911 around 7:47 a.m. See Dep. Ex. 40; Simmons Dep. 18, 23. Meads entered the holding cell and "immediately turned [Petersen] on his side." Dep. Ex. 38. Petersen "was foaming at the mouth and continued shaking for about 30 more seconds." Id. Petersen then started "coming to" and asked what had happened. Id. Meads "explained to Petersen that he appeared to have had a possible seizure . . . [and] that it could have been related to the amount of alcohol he had in his

9

system the day before." Id. Petersen insisted that he was fine. Id. Nonetheless, Meads stayed with Petersen. Meads Dep. 127.

EMS arrived at the DCDC at 7:54 a.m. Dep. Ex. 40; Meads Dep. 127. EMS personnel "checked inmate Petersen and told him he could go to the hospital but it was up to him." Dep. Ex. 38. Petersen decided to go to the hospital and was escorted to the ambulance. Id.; Dep. Ex. 61 at 2. According to the EMS report, Petersen was "alert and oriented" and "answered all questions appropriately but seem[ed] subdued." Dep. Ex. 61 at 3. EMS noted a "small contusion above [Petersen's] left eye on forehead," but Petersen said the injury was "old and occurred earlier in the week." Id. EMS also noted that Petersen "was incarcerated in DCDC yesterday after arriving at court with obvious ETOH. Per Dare County Sheriff's office BAC yesterday at court was .3." Id.

Petersen was transported to the emergency department at the Outer Banks Hospital. Id. There, he reported that he had fallen "out of bed 2 days ago" and that his last alcohol was "3 days ago." Dep. Ex. 62. Medical personnel at the hospital noted that Petersen had a "bruise at left side head." Id. Petersen received a CT scan, which showed "a left sided subdural hematoma of 0.9 centimeters in diameter with a midline shift of 1.2 centimeters." Dep. Ex. 60 at 2. A physician at the Outer Banks Hospital contacted Dr. Paul Waters, a neurosurgeon at Sentara Norfolk Hospital, who agreed to take Petersen on his service. Id. Petersen, who was considered stable, was transported by ambulance to Sentara Norfork Hospital. Id.; Dep. Ex. 86.

Upon arrival at Sentara Norfolk Hospital, Petersen was not "in any position to give [Dr. Waters] a history." Waters Dep. 10, Aug. 21, 2014. Dr. Waters noticed "a bruise on [Petersen's] left frontal temporal region." Dep Ex. 60 at 3. Dr. Waters reviewed Petersen's CT scan and noticed the hematoma, which Dr. Waters considered to be "massive," and "significant" midline shift. Id. Dr. Waters took Petersen into surgery, where he performed a parietal craniotomy and evacuated the hematoma. Id.; Waters Dep. 74, Aug. 21, 2014.

Around 5:30 p.m. on September 12, 2009, Officer Zafra informed Sergeant Meads that "Mr.

10

Petersen had been found on the floor of his cell [at] 0200 hrs." Dep. Ex. 38; Meads Dep. 129–32. Zafra also informed Meads that Sergeant Ambrose had been called to Petersen's cell at that time, that Petersen "appeared to be semi-conscious with a slow response to questions," and that Petersen "was placed back on bunk and told to go back to sleep." Dep. Ex. 38; Meads Dep. 129–32. Meads added this information to her incident report relating to Petersen's seizure incident. See Dep. Ex. 38; Meads Dep. 129. Meads also spoke with Sergeant Ambrose after he came back on duty and asked him what had happened the previous night. Meads Dep. 138. Ambrose told Meads that Petersen told Ambrose that Petersen "fell in his cell, and that [Ambrose] had given him a couple of aspirin and told him to go lay back down." Id.[4]

Petersen remained at Sentara Norfolk Hospital for some time after his surgery. "[I]t was subsequently determined that there was a further hematoma, and on December 19, 2009, [Dr. Waters] performed a second procedure, an exploration of craniotomy incision with evacuation of post-operative hematoma." Dep. Ex. 60 at 3–4. Petersen has been sober since September 11, 2009. Petersen Dep. 260, June 19, 2014.

II.

The court first considers defendants' motion to strike. Defendants contend that Dr. Adler's second supplemental report ("SSR") is untimely under this court's scheduling order and the Federal Rules of Civil Procedure. Additionally, defendants claim that Dr. Adler's SSR "is neither an allowable rebuttal report, nor is it a proper supplemental report to his initial and first supplemental reports." Defs.' Mot. Strike [D.E. 99] 1. Petersen does not argue that the report, which is titled "Second Supplemental Expert Report," is a rebuttal report. Thus, the court analyzes whether the SSR is a timely, supplemental report.

Under Rule 26(a) of the Federal Rules of Civil Procedure, "[t]he parties must supplement

_____

[4] Petersen's medication log does not reflect that Ambrose gave Petersen aspirin. See Dep Ex. 36.

11

[their expert] disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). According to Rule 26(e),

> A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process . . . .

Fed. R. Civ. P. 26(e)(1). Further,

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2).

Supplementation of an expert report permits a party to correct inadvertent errors or omissions. Supplementation, however, is not a license to amend an expert report to support a party's position on summary judgment. See, e.g., Gallagher v. S. Source Packaging, LLC, 568 F. Supp. 2d 624, 630–31 (E.D.N.C. 2008). Courts distinguish "true supplementation" (e.g., correcting inadvertent errors or omissions) from gamesmanship and have repeatedly rejected attempts by parties to bolster their position at summary judgment by "supplementing" an expert report with a "new and improved" expert report. See, e.g., MicroStrategy, Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1353–55 (Fed. Cir. 2005); Solaia Tech. LLC v. ArvinMeritor, Inc., 361 F. Supp. 2d 797, 806–07 (N.D. Ill. 2005); Beller ex rel. Beller v. United States, 221 F.R.D. 696, 701 (D.N.M. 2003) ("To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given."); Akeva L.L.C. v. Mizuno Corp., 212 F.R.D. 306, 310 (M.D.N.C. 2002) ("To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc [on] docket control and amount to unlimited expert opinion preparation."); EEOC v. Freeman, 961 F.

12

Supp. 2d 783, 797 (D. Md. 2013); Collier v. Bradley Univ., 113 F. Supp. 2d 1235, 1242 (C.D. Ill. 2000). However, supplemental reports may be necessary and proper when new information is obtained. See, e.g., Wilson v. Sundstrand Corp., No. 1:99-cv-6944, 2003 WL 22012673, at *7–8 (N.D. Ill. Aug. 25, 2003) (unpublished).

Petersen claims that "[t]he purpose of Dr. Adler's Second Supplemental Report was to supplement his opinions after reviewing evidence produced after his deposition." Pl.'s Resp. Mot. Strike [D.E. 110] 4–5. Petersen argues that the SSR "is entirely consistent with [Dr. Adler's] deposition testimony . . . and includes no new opinions; it just discusses how newly produced evidence supports his prior opinions." Id. 9; see SSR [D.E. 98-3] 2 (noting the addendum material that was reviewed for the SSR); Defs.' Mem. Supp. Mot. Strike [D.E. 100] 4 (noting the dates when the addendum material was produced). In arguing that the court should not strike the SSR, Petersen does not explain or excuse the untimeliness of the SSR. Instead, Petersen essentially contends that because the SSR only "reinforced" prior opinions, "Defendants have not been prejudiced by Dr. Adler's Second Supplemental Report." Pl.'s Resp. Mot. Strike [D.E. 110] 10.

Whether a true supplement or not, Dr. Adler's SSR was untimely. According to the parties' joint discovery plan, which was approved and ordered by this court, "[s]upplementations under Rule 26(e) are due: thirty (30) days from the appearance of the need to supplement." [D.E. 47] 4. Although the SSR relied on evidence that was obtained after Dr. Adler's initial reports and deposition, Petersen unreasonably delayed producing the SSR. The plain language of the joint discovery plan stipulates that supplementations are due thirty days "from the appearance of the need to supplement." [D.E. 47] 4 (emphasis added). Here, the need to supplement "appeared" no later August 29, 2014, the latest date any of the addendum material was served on Petersen's counsel. See Defs.' Mem. Supp. Mot. Strike [D.E. 100] 4. Accordingly, any supplemental report relying on evidence gleaned from the addendum material was due no later than September 25, 2014. Dr. Adler's SSR is dated October 20, 2014, and it was not presented to the defendants or this court until

13

November 4, 2014. Thus, the SSR is untimely.[5]

Petersen's late submission was prejudicial to the defendants because it denied defendants the opportunity to redepose Dr. Adler on his supplemental opinions. The court will not reopen the discovery period for this long-pending case to cure Petersen's failure to timely disclose the SSR. Accordingly, the court grants defendants' motion to strike Dr. Adler's second supplemental report.

### III.

In considering the defendants' motion for summary judgment, the court views the evidence in the light most favorable to Petersen and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48. The party seeking summary judgment must initially demonstrate an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate that there exists

---

[5] Alternatively, even if timely, the SSR would not have changed the court's decision concerning defendants' motion for summary judgment.

Moreover, the court questions the relevance of portions of the SSR. Although, "[t]estimony from an expert is presumed to be helpful," this principle does not apply if the testimony "concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993). Some of the opinions in the SSR (for example, Dr. Adler's "observation" that Officer Zafra's fear of retaliation by Ambrose "indicate[s] that . . . Zafra disagreed with Ambrose's handling of the . . . incident") appear to be outside of the doctor's specialty and are "matters within the everyday knowledge and experience of a lay juror." Id.; see Pl.'s Resp. Mot. Strike [D.E. 110] 7; SSR [D.E. 98-3] 4. Thus, the court questions the assistance provided by the SSR. "Trouble is encountered . . . when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense." Kopf, 993 F.2d at 377; Scott v. Sears, Roebuck & Co., 789 F.2d 1052, 1055 (4th Cir. 1986).

14

a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 586–87.

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). It is insufficient to show a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

A.

In count one, Petersen alleges negligence and gross negligence under North Carolina law against Meads and Ambrose in their individual capacities and against Sheriff Doughtie in his official capacity. See Second Am. Compl. ¶¶ 10, 103–114.

As for Petersen's negligence and gross negligence claims against Ambrose and Meads in their individual capacities, public-official immunity bars the claims. Generally, "a public official is immune from personal liability for mere negligence in the performance of his duties, but he is not shielded from liability if his alleged actions were corrupt or malicious or if he acted outside and beyond the scope of his duties." Slade v. Vernon, 110 N.C. App. 422, 428, 429 S.E.2d 744, 747 (1993), implied overruling on other grounds in Boyd v. Robeson Cty., 169 N.C. App. 460, 621 S.E.2d 1 (2005); see Russ v. Causey, 468 F. App'x 267, 272–74 (4th Cir. 2012) (unpublished); Smith v. Hefner, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952). Where, as here, "a defendant performs discretionary acts as part of his or her official or governmental duties, to sustain a suit for personal or individual liability, a plaintiff must allege and prove that the defendant's acts were malicious or corrupt." Schlossberg v. Goins, 141 N.C. App. 436, 446, 540 S.E.2d 49, 56 (2000).

A public officer will not lose public-official immunity if the officer's judgment is misguided, so long as the public officer acted without malice or corruption. See, e.g., Grad v. Kaasa, 312 N.C.

15

310, 313, 321 S.E.2d 888, 890 (1984). "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Id., 321 S.E.2d at 890. "An act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." Id., 321 S.E.2d at 890–91; see Miller v. Jones, 224 N.C. 783, 787, 32 S.E.2d 594, 597 (1945) ("The [corrupt or malicious] act or omission . . . takes on the guise of a malicious tort."). Furthermore, public officers in North Carolina are presumed to act in good faith. See, e.g., In re Annexation Ordinance No. 300-X, 304 N.C. 549, 551, 284 S.E.2d 470, 472 (1981); Huntley v. Potter, 255 N.C. 619, 628, 122 S.E.2d 681, 687 (1961). A party may overcome that presumption only with competent and substantial evidence. See Leete v. Cty. of Warren, 341 N.C. 116, 119, 462 S.E.2d 476, 478 (1995); Huntley, 255 N.C. at 628, 122 S.E.2d at 686–87.

As for Ambrose, Petersen has presented no competent evidence that Ambrose acted maliciously or corruptly in dealing with Petersen. Viewing the facts in the light most favorable to Petersen, when Ambrose learned that Petersen had fallen out of bed, he returned Petersen to his bunk and instituted a special watch for him. From 2:37 a.m. until the end of Ambrose's shift, Petersen was monitored every 15 minutes. See Dep. Ex. 47; Ambrose Dep. 12–24; Spruill Dep 17–18, 33–34; Zafra Dep. 60–62. To the extent Ambrose failed to inform the day shift as to the need to continue a special watch on Petersen, Petersen has not shown that the omission was deliberate, malicious, or anything other than negligent. Likewise, to the extent Petersen argues that Ambrose's failure to "call medical when he knew was mandated to do so" demonstrates malice, Pl.'s Resp. Mot. Summ. J. [D.E. 98] 30, Petersen has not shown that Ambrose knew Petersen was in need of immediate medical care or that Ambrose's decision not to contact medical was intended to be prejudicial or injurious to Petersen. Thus, Petersen cannot overcome Ambrose's public-official immunity.

As for Meads, Petersen has failed to raise a genuine issue of material fact about whether

16

Meads acted maliciously or corruptly when booking Petersen into jail on September 11, 2009, or after resuming duty on September 12, 2009. Although Meads was aware that Petersen was intoxicated when she booked him into jail, no evidence suggests that Meads knew Petersen was in need of immediate medical care or was aware of his exact BAC. See Meads Dep. 22, 58; Dep. Exs. 29, 35. Meads did not notice any visible signs of illness or injury on Petersen during booking. Meads Dep. 99; see Dep. Ex. 35. Furthermore, Meads testified that she had only Petersen's temporary commitment order when booking Petersen, which, unlike the formal contempt order, did not include Petersen's BAC. See Meads Dep. 22, 58; Dep. Exs. 28–29.[6] Moreover, DCDC policy required admitting officers to observe inmates for "severe intoxication that would lead the [admitting] officer to believe that the inmate may be in need of immediate medical care." Dep. Ex. 14 at 2. As an example, the policy listed "[s]evere intoxication where the individual . . . registers a .34 on the intoxilyzer." Id. (emphasis added).

Meads also testified that she more than likely told the detention officers to monitor Petersen and wrote it in her pass-down notes. See Meads Dep. 77–78, 94, 99–100, 165, 167. Nonetheless, even if Meads failed to do so or her officers failed to follow her directions, Petersen has not shown that such failures demonstrate that Meads acted with malice. As for Meads's actions on September 12, 2009, Petersen also has not raised a genuine issue of material fact regarding whether Meads acted maliciously. Meads checked on Petersen after Officer Zafra told her to do so, immediately transferred Petersen to holding when she noticed the change in his signature, and cared for Petersen during and immediately after his seizure. Cf. Meads Dep. 183 (After his surgery, Petersen told

---

[6] To the extent Petersen seeks to use his motion for sanctions for spoliation to have the court infer that Meads knew Petersen's BAC at the time of booking, the court declines to do so because "even if the undersigned were to find that an adverse inference instruction was appropriate as a spoilation sanction, such an inference does not constitute the evidence necessary to defeat defendant[s'] Summary Judgment Motion." Shlian v. Shoppers Food Warehouse Corp., No. BPG-13-954, 2014 WL 1320102, at *7 (D. Md. Mar. 31, 2014) (unpublished). Additionally, Petersen has not shown that an adverse inference instruction is warranted.

17

Meads that "if it hadn't of been for [her] doing what [she] did, he probably would have died.").
Accordingly, public-official immunity bars Petersen's claims against Sergeant Meads.

As for Petersen's negligence and gross negligence claims against Sheriff Doughtie in his
official capacity, Sheriff Doughtie waived governmental immunity to the extent he obtained a surety
bond as required by North Carolina law. See White v. Cochran, 748 S.E.2d 334, 339–40 (N.C. Ct.
App. 2013).[7] However, Petersen has failed to raise a genuine issue of material fact on the merits of
his claim. To survive summary judgment on a negligence claim, a plaintiff "is required to offer legal
evidence tending to establish beyond mere speculation or conjecture every essential element of
negligence, and upon failure to do so, summary judgment is proper." Young ex rel. Young v. Fun-
Servs.-Carolina, Inc., 122 N.C. App. 157, 162, 468 S.E.2d 260, 263 (1996) (quotation and alteration
omitted); see Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005) (holding that
judgment as a matter of law "must be entered" when the a verdict for the nonmoving party would
require such speculation or conjecture). To prove negligence, a plaintiff must show "(1) a legal duty;
(2) a breach thereof; and (3) injury proximately caused by the breach." Bridges v. Parrish, 366 N.C.
539, 541, 742 S.E.2d 794, 796 (2013) (quotation omitted). Defendants argue that Petersen "cannot
establish the causation element." Defs.' Reply Mot. Summ. J. [D.E. 115] 9. The court agrees.

To the extent Petersen argues that the officers' failure to monitor him four times an hour
constitutes negligence, Petersen has not shown that any failure to monitor caused him to fall or that

_____

[7] The county's purchase of liability insurance covering Sheriff Doughtie did not waive
governmental immunity. A county may waive governmental immunity by purchasing insurance, but
any waiver is limited to the extent of the insurance coverage. See, e.g., N.C. Gen. Stat. §153A-
435(a); Evans v. Hous. Auth., 359 N.C. 50, 57, 602 S.E.2d 668, 673 (2004); Satorre v. New Hanover
Cty. Bd. of Comm'rs, 165 N.C. App. 173, 176, 598 S.E.2d 142, 144 (2004). If "the insurance policy
does not indemnify [the] defendant against the negligent acts alleged in plaintiff's complaint,
defendant has not waived its sovereign immunity." Doe v. Jenkins, 144 N.C. App. 131, 135, 547
S.E.2d 124, 127 (2001); see Dawes v. Nash Cty., 357 N.C. 442, 445–46, 449, 584 S.E.2d 760, 763,
765 (2003); Estate of Earley ex rel. Earley v. Haywood Cty. Dep't of Soc. Servs., 204 N.C. App.
338, 341, 694 S.E.2d 405, 408 (2010). The county's insurance policy expressly preserved
governmental immunity. See Outten Aff. [D.E. 84-3]; Outten Aff. Ex. A [D.E. 84-5] 50.

any delay in treatment exacerbated his injuries. See Waters Dep. 61–62, Aug. 21, 2014 (There's "no way [to] say [that] whether the subdural was taken out two minutes after [Petersen] fell, or when [Dr. Waters] took it out, made a difference.").

Although there is certainly evidence that Petersen fell while in jail and there is a factual dispute regarding when the bruise on Petersen's head developed, Petersen has not created a genuine issue of material fact concerning whether a fall in jail caused his subdural hematoma. In an attempt to prove causation, Petersen relies on a scintilla of evidence from defendant's medical expert, Dr. Matera, who testified that he "more than likely" would have expected Petersen to have had a visible bruise in his booking photograph if Petersen had "struck his forehead prior to coming to [DCDC], and the force of the blow was significant enough to cause a subdural hematoma" and "if [the bruise from the earlier fall] was on his forehead or face." Matera Dep. 41–42. This testimony cannot survive defendants' motion for summary judgment because it does not establish, without conjecture or speculation on behalf of the factfinder, that the fall at the DCDC caused the subdural hematoma. Dr. Matera's hypothetical conjecture does not overcome the testimony of Petersen's treating neurosurgeon, Dr. Waters, who, although recognizing that Petersen's injuries could be consistent with a fall in jail, also testified that the subdural hematoma "looked like it had just happened . . . in that . . .week time frame" and "could be" consistent with an earlier fall. Waters Dep. 24–25, 38–41, Aug. 21, 2014. Dr. Waters testified that he could not say which fall caused Petersen's subdural hematoma, and could only say that the "subdural was the result of an injury 24, 48, 72 hours from when [he] saw [Petersen]." Id. 41, 62. Petersen's evidence concerning causation "would require speculation or conjecture on the part of the factfinder, which is impermissible." Fun Servs.-Carolina, 122 N.C. App. at 162, 468 S.E.2d at 263. "[I]t is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture" in order to prevent the jury's "impermissible but understandable resort to such factors as sympathy and the like" to draw inferences where sufficient evidentiary support is absent. Lovelace v. Sherwin-

Williams Co., 681 F.2d 230, 241 (4th Cir. 1982). Accordingly, summary judgment is appropriate.

Alternatively, in answering plaintiff's complaint, defendants also raised a contributory negligence defense. See Answer [D.E. 60] 20. Although summary judgment is "rarely appropriate" in cases involving contributory negligence, summary judgment may be properly granted "where the evidence establishes the plaintiff's own negligence so clearly that no other reasonable conclusion may be reached." Nicholson v. Am. Safety Util. Corp., 346 N.C. 767, 772, 488 S.E.2d 240, 244 (1997); see Kelly v. Regency Ctrs. Corp., 203 N.C. App. 339, 342, 691 S.E.2d 92, 95 (2010). Here, given Petersen's failure of proof on causation, the court need not address contributory negligence. Nonetheless, the court acknowledges that a reasonable jury could find that Petersen's voluntary decision to drink himself to a .32 BAC before his court appearance, which resulted in conviction for being in contempt of court, contributed, at least in part, to his fall and resultant injuries.

In sum, public-official immunity bars Petersen's negligence and gross negligence claims against Meads and Ambrose, and Petersen has failed to raise a genuine issue of material fact on the merits of the negligence claims against Sheriff Doughtie. Thus, the court grants summary judgment to defendants on count one.

B.

Because Petersen's negligence and gross negligence claim against Sheriff Doughtie failed, Petersen's statutory-bond claim also fails. Thus, the court grants defendants' motion for summary judgment on count two.

C.

As for Petersen's section 1983 claim for deliberate indifference to serious medical need against Sergeant Meads and Sergeant Ambrose, defendants argue that Meads and Ambrose are entitled to qualified immunity. See Defs.' Mem. Supp. Mot. Summ. J. [D.E. 86] 12–19.

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly

20

established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); Messerschmidt v. Millender, 132 S. Ct. 1235, 1244–45 (2012); Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011); Pearson v. Callahan, 555 U.S. 223, 231–32 (2009). Qualified immunity protects government officials from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (quotations omitted); Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992).

"Whether an official protected by qualified immunity may be held personally liable for an alleged unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Messerschmidt, 132 S. Ct. at 1245 (quotations and alterations omitted). An official should prevail in asserting "qualified immunity if a reasonable [official] possessing the same information could have believed that his conduct was lawful." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991); see Messerschmidt, 132 S. Ct. at 1248.

When evaluating qualified immunity, a court must "identify the specific right that the plaintiff asserts was infringed by the challenged conduct." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999); see Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 565 n.9 (4th Cir. 2011). Then, a court must ask two questions to determine whether qualified immunity applies. See Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 232; Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009). First, "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. Second, "whether the right at issue

21

was clearly established at the time of defendant's alleged misconduct." Id. A court may answer either of these questions first. Id. at 236; see Reichle, 132 S. Ct. at 2093; al-Kidd, 131 S. Ct. at 2080. A defendant is entitled to qualified immunity if the answer to either question is "no." Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 232.

i.

The court first considers whether Petersen has established the violation of a right secured by the Constitution. "To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); see Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Additionally, a section 1983 plaintiff must demonstrate the personal involvement of a defendant. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 675–77 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–94 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

Count three alleges that Sergeant Ambrose and Sergeant Meads were deliberately indifferent to Petersen's medical needs in violation of the Eighth and Fourteenth Amendments. See Second Am. Compl. ¶¶ 123–29.[8] "[T]o establish a claim of deliberate indifference to medical need, the need

---

[8] Petersen claims that he was a "pretrial detainee" and identifies both the Eighth Amendment and the Fourteenth Amendment as potential sources of his claim. See Second Am. Compl. ¶ 124; Pl.'s Resp. Mot. Summ. J. [D.E. 98] 1. Defendants do not address Petersen's invocation of both amendments on the merits and instead argue only that "[t]o the extent that Plaintiff's deliberate indifference claims are based on allegations that Plaintiff was denied medical care as a pretrial detainee," the "due process rights of detainees are at least coextensive with the Eighth Amendment rights of convicted prisoners" and "are not implicated by the lack of due care of an official causing unintended injury to life, liberty or property." Defs.' Mem. Supp. Mot. Summ. J. [D.E. 86] 13, 17.

Although courts generally evaluate confinement conditions of civil-contempt detainees under the Due Process Clause of the Fourteenth Amendment, rather than under the Eighth Amendment, conditions-of-confinement claims by criminal-contempt detainees are governed by the Eighth Amendment because those subject to criminal contempt are considered "convicted prisoners." Compare Chadwick v. Court of Common Pleas of Del. Cty., 244 F. App'x 451, 452–55 (3d Cir. 2007) (per curiam) (unpublished), and Dalenko v. Stephens, No. 5:12-CV-122-F, 2014 WL 794045,

22

must be both apparent and serious, and the denial of attention must be both deliberate and without legitimate penological objective." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Thus, a plaintiff must prove "that the officers acted with 'deliberate indifference' (subjective) to the inmate's 'serious medical needs' (objective)." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008); see Estelle v. Gamble, 429 U.S. 97, 104 (1976). The objective prong requires the prisoner to show that he suffered from a serious medical need, a need "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241. The subjective prong requires the prisoner to show that the prison official acted with deliberate indifference. See, e.g., Farmer v. Brennan, 511 U.S. 825, 835–36 (1994); Estelle, 429 U.S. at 104; De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013); Iko, 535 F.3d at 241; Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998).

"[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. Deliberate indifference requires that an official actually know of and disregard an objectively serious condition, medical need, or risk of harm. See id. at 837–38; De'lonta, 708 F.3d at 525. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

---

at *8 n.6 (E.D.N.C. Feb. 27, 2014) (unpublished), with Barringer v. Clackamas Cty., No. CV 09-068-AC, 2010 WL 5349206, at *5 (D. Or. Nov. 22, 2010) (unpublished), and Qader v. New York, 396 F. Supp. 2d 466, 470 (S.D.N.Y. 2005), and Sharp v. Kelsey, 918 F. Supp. 1115, 1122–23 (W.D. Mich. 1996); see also Thompson v. Cty. of Cook, 412 F. Sup. 2d 881, 887 (N.D. Ill. 2005). Petersen was placed in criminal contempt. See Dep. Exs. 3, 25. Thus, Petersen's claim is governed by the Eighth Amendment.

In any event, the analysis under the Due Process Clause and the analysis under the Eighth Amendment are materially indistinguishable. See, e.g., Pittman ex rel. Hamilton v. Cty. of Madison, 746 F.3d 766, 775 & n. 32 (7th Cir. 2014); Riley v. Dorton, 115 F.3d 1159, 1166–67 (4th Cir. 1997) (en banc), overruled on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); Hill v. Nicodemus, 979 F.2d 987, 991–92 & n.* (4th Cir. 1992).

inference." Farmer, 511 U.S. at 837. "It is not enough that the [prison official] should have recognized" the objectively serious condition, medical need, or risk of harm. Iko, 535 F.3d at 241(quotation and citation omitted).

A prisoner is not entitled to choose his course of treatment. See Jackson v. Sampson, 536 F. App'x 356, 357 (4th Cir. 2013) (per curiam) (unpublished); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) (per curiam). Mere negligence in diagnosis or treatment does not state a constitutional claim. See, e.g., Estelle, 429 U.S. at 105–06; Grayson, 195 F.3d at 695–96. Disagreements over medications and forms of treatment concern medical judgments and not the Eighth Amendment. See Estelle, 429 U.S. at 105–06; Russell, 528 F.2d at 319. Rather, to satisfy the subjective prong, a plaintiff must prove "actual knowledge of the risk of harm to the inmate." Iko, 535 F.3d at 241 (emphasis omitted). "A prison official's subjective actual knowledge can be proven through circumstantial evidence . . . ." Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015).

Beyond such actual knowledge, the prison official "must also have recognized that his actions were insufficient to mitigate" the objectively serious condition, medical need, or risk of harm. Iko, 535 F.3d at 241 (quotation and emphasis omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited . . . ." Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010); see Wilson v. Seiter, 501 U.S. 294, 298–99 (1991). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241.

Petersen has not created a genuine issue of material fact concerning whether he was suffering from an objectively serious medical need. Specifically, Petersen has not shown that his medical need was "both apparent and serious." Grayson, 195 F.3d at 695. To the extent Petersen claims his medical need was apparent and serious to Meads at booking, Petersen had "no visible external injuries. He did not have trouble breathing. He was not bleeding, was not vomiting or choking, and

24

was not having a seizure." Id. at 695. Petersen was able to sign his name legibly and in cursive. See Dep. Exs. 34–35. Petersen "was conscious, at least somewhat responsive, and able to answer questions." Grayson, 195 F.3d at 695. Although Petersen smelled of alcohol, that fact "hardly distinguish[es] him from the multitude of drug and alcohol abusers the police deal with everyday," and "an officer could hardly be faulted under Estelle for believing that [Petersen] needed nothing so much as to sleep it off." Id. at 696. Rejecting a similar argument, the Fourth Circuit noted that to hold otherwise would be "to mandate as a matter of constitutional law that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers." Id. Even though Petersen's BAC was .32, no evidence suggests that Meads was aware of his exact BAC. Furthermore, Petersen's BAC was actually under the .34 guideline recognized by DCDC policy as "severe intoxication . . . in need of immediate medical care." Dep. Ex. 14 at 2.

To establish that he possessed an objectively serious medical need before Sergeant Ambrose, Petersen notes that Officer Zafra told Sergeant Meads on September 12, 2009, that she, Spruill, and Ambrose saw Petersen in a "semi-conscious" state around 2:00 a.m and that Petersen was "slow [to] respon[d]" to Ambrose's questions. See Dep. Ex. 38 at 2. According to DCDC policy, "semi-conscious" may signal a "medical emergency," but is not defined. Dep. Ex. 11 at 2.

Officer Meads's hearsay account of what Officer Zafra perceived does not establish that Petersen suffered from a medical need "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko, 535 F.3d at 241. Sergeant Ambrose testified that he considered "semi-conscious" to mean "when you go to wake someone up or go to try and wake someone up, that they don't wake up, you have to make an effort or use . . . smelling salts or water . . . to get them to come back to you." Ambrose Dep. 29. There is no evidence that such efforts were needed for Petersen. Furthermore, Ambrose noted that he considered "[s]till being half asleep or even mostly asleep" to be very similar to "semi-unconscious." Id. Ambrose can hardly be faulted under Estelle for thinking that finding a drunk, nonbleeding inmate on the floor of his cell in the

25

middle of the night was the result of the inmate's intoxication and sleepiness, rather than a serious medical need. Moreover, relevant expert testimony shows that subdural hematomas cannot be physically observed, and are only discoverable through medical exams and computer scans of the brain. See Waters Dep. 17–18, 29, Aug. 21, 2014; Adler Dep. 75–76 (plaintiff's expert noting that "a good neurologic exam" by a medical professional is necessary to differentiate an intoxicated person from one suffering a subdural hematoma).

Alternatively, Petersen has not created a genuine issue of material fact concerning whether Meads or Ambrose acted with deliberate indifference to his medical needs. As discussed, Petersen has not shown that either Meads or Ambrose had actual knowledge of an objectively serious condition.[9] Furthermore, Petersen has not shown that either Ambrose or Meads subjectively disregarded Petersen's serious medical needs. Rather, Ambrose placed Petersen on special watch starting at 2:37 a.m., and no evidence suggests that Ambrose "recognized that [these] actions were insufficient to mitigate" any objectively serious condition or medical need of Petersen's. Iko, 535 F.3d at 241 (quotation and emphasis omitted). Likewise, although Meads was aware that Petersen was "highly intoxicated," Petersen has not established that her actions were anything other than negligent, and "deliberate indifference entails something more than mere negligence." Farmer, 511 U.S. at 835.

Next, Petersen cites defendants' failure to monitor him four times per hour from the inception of his incarceration in light of his intoxication and notes that this failure violated DCDC policy. However, "the mere failure to comply with [a] state regulation and jail policy is not a constitutional violation." Smith v. Atkins, 777 F. Supp. 2d 955, 965 (E.D.N.C. 2011) (collecting cases). Furthermore, no evidence indicates that if Meads or Ambrose had checked Petersen four times per hour then he would not have fallen or hit his head.

_____

[9] The court agrees with defendants that some evidence tending to show that Officer Zafra had actual knowledge of a medical need does not establish that Sergeant Ambrose had actual knowledge.

In sum, Petersen has not created a genuine issue of material fact concerning an underlying constitutional violation. Thus, his section 1983 claim against Meads and Ambrose fails.

ii.

Alternatively, to the extent Petersen bases his section 1983 claim on defendants' failure to monitor him more closely or to adhere to a DCDC monitoring policy, the claim fails. Simply put, as of September 11, 2009, neither the Supreme Court nor the Fourth Circuit had clearly established that the Constitution includes a right to proper implementation of monitoring protocols. See, e.g., Taylor v. Barkes, 135 S. Ct. 2042, 2044–45 (2015) (per curiam); Davis v. Scherer, 468 U.S. 183, 194–96 (1984).

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle, 132 S. Ct. at 2093 (quotations and alteration omitted); see al-Kidd, 131 S. Ct. at 2083; Anderson v. Creighton, 483 U.S. 635, 640 (1987); Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009). A plaintiff may allege that a right was clearly established without citing "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083; see Carroll v. Carman, 135 S. Ct. 348, 350 (2014) (per curiam); Reichle, 132 S. Ct. at 2093; see also Wilson, 141 F.3d at 114. The "clearly established standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." Reichle, 132 S. Ct. at 2093 (quotations omitted). "The law is clearly established such that an [official's] conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the State." Wilson, 141 F.3d at 114; cf. Reichle, 132 S. Ct. at 2094 (assuming without deciding that controlling federal court of appeals authority could be a dispositive source of clearly established law within a given circuit); Hope v. Pelzer, 536 U.S. 730, 741–42 (2002)

27

(concluding that binding circuit precedent, a state agency regulation, and a Justice Department report combined to create clearly established law). Notably, the "clearly established" question tests whether the right was "clearly established" on the date of the challenged conduct. See Taylor, 135 S. Ct. at 2044–45; Reichle, 132 S. Ct. at 2093.

Petersen claims that Iko v. Shreve, 535 F.3d 225 (4th Cir. 2008), "clearly established that the failure of detention officers to ensure that a prisoner who had a serious medical need received medical treatment in violation of prison directives constitute[s] deliberate indifference to serious medical need." Pl.'s Resp. Mot. Summ. J. [D.E. 98] 25. The court disagrees with Petersen's reading of Iko. Notably, Iko did not involve a failure-to-monitor claim, and the Fourth Circuit did not hold or clearly establish in Iko that any violation of prison directives constitutes deliberate indifference to a serious medical need. Rather, in Iko, the Fourth Circuit considered the jail's policy mandating treatment for persons exposed to chemical agents as circumstantial evidence that the defendants were actually aware of a risk of harm to an inmate who had been pepper-sprayed. Iko, 535 F.3d at 241–42. Thus, Iko did not clearly establish that a reasonable official would know that any deviation from established jail policy concerning monitoring would violate a constitutional right.

In sum, Petersen's section 1983 claim against Meads and Ambrose for deliberate indifference to serious medical need fails. Accordingly, the court grants summary judgment to defendants on count three.

IV.

Finally, Petersen asks this court to sanction defendants "because key evidence, including the original temporary commitment Order, the shift supervisor pass down notes, and the pod pass down notes related to the September 11/29, 2009 incident were destroyed." Pl.'s Mem. Supp. Mot. Sanctions [D.E. 92] 1–2. Specifically, Petersen asks the court to "sanction Defendants with an adverse jury instruction to adequately level the playing field under the circumstances of this case." Id. 19 (quotation omitted). Petersen requests

28

that the jury be instructed that they may infer that the destroyed documents would have established that Meads was aware that plaintiff's BAC was '.32+' at the time she booked him into the DCDC, that Meads did not notify her shift or the following shift that plaintiff required special monitoring, that Ambrose knew that plaintiff had fallen in his cell and hurt his head, that plaintiff had a visible head injury, that plaintiff complained of his head injury and head pain and requested medical attention, that plaintiff was 'semi-conscious and slow to respond' to Ambrose's question, that Ambrose administered aspirin to plaintiff and did not log this into plaintiff's medical administration record, that Ambrose was aware that plaintiff suffered a serious medical condition, that Ambrose ordered plaintiff to go back to sleep, that Zafra and Spruill observed the above, that Zafra and Spruill disagreed with Ambrose's treatment of plaintiff, that Zafra and Spruill also believed that plaintiff suffered a serious medical condition, and that Zafra and Spruill started special monitoring of plaintiff on their own volition out of their concerning for plaintiff's serious medical condition.

Id. 19–20. "Further, plaintiff requests that the Court bar defendants from introducing secondary evidence . . . that may rebut these adverse inferences." Id. 20.

Defendants oppose Petersen's motion. They deny deliberate destruction of the original commitment order or the notes and aptly argue that "Plaintiff requests broad and overreaching adverse inference instructions that are apparently aimed at relieving him of any evidentiary burden at trial, rather than remedying any alleged spoliation." Defs.' Resp. Mot. Sanctions [D.E. 96] 9.

In light of the court's disposition on defendants' motion for summary judgment, there will be no jury to instruct. Thus, the court need not examine the dispute concerning defendants' record-retention policy, and dismisses as moot Petersen's motion for sanctions.

V.

In sum, the court GRANTS defendants' motion to strike [D.E. 99], GRANTS defendants' motion for summary judgment [D.E. 78], and DISMISSES as moot plaintiff's motion for sanctions for spoliation. Defendants may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This **2 5** day of September 2015.

JAMES C. DEVER III
Chief United States District Judge